**DISTRICT OF COLUMBIA, Appellant,**

v.

**ACME REPORTING COMPANY, Appellee.**

No. 85–941.

District of Columbia Court of Appeals.

Argued June 3, 1987.
Decided Aug. 31, 1987.

Richard G. Amato, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Acting Corp. Counsel, James R. Murphy, Acting Corp. Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corp. Counsel, Richard L. Aguglia, Acting Deputy Counsel, and Julia L. Sayles, Asst. Corp. Counsel, Washington, D.C., were on the brief, for appellant.

William L. Neff, Washington, D.C., for appellee.

Before NEBEKER and NEWMAN, Associate Judges, and PAIR, Senior Judge.

PAIR, Senior Judge:

This appeal is from an order of the Tax Division of the Superior Court which held that the court reporting services of appellee, Acme Reporting Company (Acme), were improperly taxed by appellant, the District of Columbia (the District).[1] The court ordered the refund to Acme of $45,692.47 plus interest, which amount the court found had been improperly assessed and collected by the District. We affirm.

I

The pertinent facts which, for the most part are undisputed, may be summarized as follows. After an audit of Acme and other companies providing court reporting services, the District, on July 1, 1983, assessed Acme for sales and use tax deficiencies in the amount of $47,454.60. The tax authorities determined that the monies received by Acme for its court reporting services were subject to District sales and use taxes.[2] Acme paid the taxes assessed and filed a timely petition in the Tax Division seeking cancellation of the assessment and a refund of the amount paid plus interest.[3]

The matter came before the Tax Division on cross-motions for summary judgment, which were denied. After a trial on March 25, 1985, the court ruled that court reporting services are not "public stenographic" services for purposes of D.C. Code §§ 47-2001 (n)(1)(H) and 47-2201(a)(1)(G) (1981). The court then ordered that the District modify its records to reflect a tax exempt status; that the tax assessment be cancelled and that the taxes paid, including any penalties and interest, be refunded to Acme.[4]

Acme, presently a Delaware corporation, was, during the tax periods in question, a Maryland Corporation engaged in the business of providing court reporting services in Maryland and the District of Columbia. Acme is, or has been, the official court reporter for the Civil Aeronautics Board, the National Labor Relations Board, the Securities and Exchange Commission, the Department of Defense, the Department of Labor, the U.S. House of Representatives, the U.S. Senate, the U.S. Claims Court and the U.S. Tax Court. The majority of its court reporting services are provided pursuant to contracts with the federal government. Acme does no court reporting for either the Superior Court of the District of Columbia or this court.

The services provided by Acme's court reporters include attendance at and the recording and transcription of legal proceed

1. The trial court's opinion in this matter is reported in *Acme Reporting Co. v. District of Columbia,* 113 Daily Wash.L.Rptr. 1533 (July 31, 1985).

2. The measure of the tax was the sale of transcripts ordered by private litigants and did not include receipts by Acme from the sale of transcripts to the District of Columbia or federal governments, who by statute are exempt from such tax. *See* D.C.Code § 47-2005(1), (2) (1981).

3. Although the assessment was for $47,454.60, Acme admitted in its reply to the District of Columbia's answer to Acme's petition, that $1,762.13, which represented the use tax portion, was not in controversy and that it did not intend to seek cancellation of that part of the assessment. Thus, only $45,692.47 is in dispute on appeal.

4. The imposition of penalty and interest was waived by the District of Columbia.

ings such as judicial trials and hearings before administrative agencies. Each reporter is responsible for producing an accurate and full recording of the legal proceeding attended so as to protect the tribunal and parties by a complete record. Acting as an official of the court or administrative tribunal, the reporters administer oaths to witnesses, bear responsibility for all exhibits, and testify as to the accuracy of the record.

The final product of Acme's court reporting services is a verbatim transcript of the proceeding Acme was engaged to report. All prepared transcripts are furnished to either the court or government agency holding the proceeding or to the parties to the proceeding. A certain amount of tangible personal property, such as paper binding and covers, is used by Acme to produce transcripts of the reported proceedings. The cost of these items constitutes less than four percent of the amount Acme charges its customers for court reporting services and no separate charge is made to customers for such materials.

When Acme commenced business operations in the District of Columbia, it sought tax advice from its accounting firm respecting the applicability of the District's sales and use taxes to its court reporting services. The accounting firm advised, by letter, that the services involved in recording testimony and printing it for customers were not subject to the District's sales and use taxes and that additional sales of copies of resulting documents to an "interested party" to the proceeding were not subject to the taxes.

Subsequently, Acme received from its accounting firm a copy of a memorandum prepared by Mr. Arnold M. Malech, then the Executive Officer of the District of Columbia courts, addressed to court reporters employed by the District of Columbia courts. This memorandum provided guidance concerning the applicability of the District's sales and use taxes to the sales of

transcripts prepared by court reporters employed by the District of Columbia courts. The memorandum concluded that the District's sales and use taxes did not apply to sales of transcripts by court reporters of the District of Columbia courts except when purchased by a non-party to the proceeding being recorded, such as a newspaper reporter. The memorandum directed questions to James Andy, an employee of the Department of Finance and Revenue (the Department). Relying on the opinion of its accounting firm and the memorandum from Mr. Malech, Acme determined that the District's sales and use taxes did not apply to monies received for its court reporting services.

In November of 1969, the Department sent a notice to all registered sales and use taxpayers concerning the 1969 amendments imposing sales and use taxes on public stenographic services. This notice, however, did not define the term "public stenographic services." When the Department promulgated a regulation to define the term "public stenographic services," the regulation simply stated that "the term public stenographic services includes typing services." 9 DCMR § 468.3 (1986).

However, Mr. Edward M. Many, Manager of the Tax Audit and Liability Division of the District of Columbia Department of Finance and Revenue, testified at trial that the Department has always taken the position that the term "public stenographic services" includes court reporting services, but did not specifically refer to any written or oral interpretation by the Department which included court reporters within the term "public stenographics services."

In 1981, when the Department initiated sales and use tax audits of law firms, it observed that the firms were not being charged sales or use tax on amounts paid for court reporting services. The Department then conducted audits of several companies engaged in the business of providing court reporting services.[5]

---

5. The record reveals that the Department has never conducted a sales and use tax audit of a court reporter employed by a District of Columbia court. In conjunction with this fact, we

note that District of Columbia Court Reporter Rule 17, which was formally promulgated and became effective on March 22, 1973, provides that sales of transcripts by court reporters are

Acme first learned that the Department interpreted the term "public stenographic services" to include court reporting services during the Department's sales and use tax audit of Acme in 1982. Acme immediately began collecting sales and use taxes on receipts from its court reporting services, including the sales of transcripts. As a result of the audit, the District sent the notice dated July 1, 1983, which assessed the tax deficiencies contested in this appeal.

## II

Initially, a brief review of the tax scheme in effect throughout the period of the deficiency assessment (December 1, 1979 through November 30, 1982) is necessary. The Gross Sales Tax and the Compensating-Use Tax laws of the District are substantially similar in relation to the issues we address today. Under D.C. Code § 47–2002 (1981), a sales tax is imposed on the retail sale of "certain selected services (defined as 'retail sale' and 'sale at retail' in this chapter)." *See also* D.C. Code § 47–2202 (1981) (similar use tax provision on "service sold or purchased at retail sale"). D.C. Code § 47–2001(n)(1)(H) (1981) includes within the definition of "retail sale" and "sale at retail"

> the sale ... of any tangible personal property or service taxable under the terms of this chapter.... For the purpose of the tax imposed by this chapter, these terms shall include but shall not be limited to ... the sale of or charges for ... public stenographic services[.]

*See also* D.C. Code § 47–2201(a)(1)(G) (1981) (identical use tax provision). Thus, it is clear that "public stenographic services" are taxable under the Code.

However, exempt from the definition of "retail sale" or "sale at retail," and therefore not taxable under § 47–2001(n)(2)(B) or § 47–2201(a)(2)(B) are professional or personal service transactions which involve sales as inconsequential elements for which no separate charges are made. Acme argues that its court reporting services are exempt from sales and use taxation pursuant to § 47–2001(n)(2)(B) and § 47–2201(a)(2)(B) as "personal services transactions." The District counters that since Acme provides "public stenographic services," its sales are taxable under § 47–2001(n)(1)(H) and § 47–2201(a)(1)(G).

## III

The District's principal argument on appeal is that the tax court erred in ruling that Acme's court reporting services do not fall within the meaning attributed to "public stenographic services" in D.C. Code §§ 47–2001 and 47–2201. The District maintains that the term is not ambiguous and that Acme's activities clearly fall within the plain meaning of the statutory provisions in dispute. Moreover, the District argues that its interpretation of the phrase is a long-standing one to which substantial deference must be paid.

Acme, however, counters that its court reporting services cannot be equated with "public stenographic services" within the meaning of the statutes. An application of the rules of statutory construction, Acme contends, compels the conclusion that the term does not encompass court reporting services. Moreover, Acme complains that it has never been put on notice, either through clear statutory language, or otherwise, of the necessity to collect the contested taxes. Finally, Acme asserts that, because it has never had reason to be aware of the District's ostensible statutory interpretation, any claimed long-standing administrative interpretation by the District should be accorded little, if any, weight.

We begin our analysis of the issue presented by recognizing that the scope of

---

not subject to District of Columbia sales and use taxes except when a transcript is sold to a non-party to the proceedings being recorded, such as a newspaper reporter. We do not find it necessary to pass upon the validity of Rule 17.

Acme does not take issue with the taxation of sales of transcripts to non-parties. Acme apparently views such sales as falling outside the exemption of § 47–2001(n)(2)(B) and § 47–2201(a)(2)(B), irrespective of how one defines the "public stenographic services" exceptions thereto. In any event, Acme claims that the only sales it has made during the time period in dispute were to parties to the proceeding.

our review is controlled by D.C. Code § 47–3304(a) (1981). "Decisions of the Superior Court in civil tax cases are reviewable in the same manner as other decisions of the court in civil cases tried without a jury." *Id.; see also* D.C. Code § 17–305(a) (1981). This means we will not set aside the tax court's judgment, except for errors of law. *See Riggs v. Aetna Insurance Co.,* 454 A.2d 818, 820 (D.C. 1983). We must accept the court's findings of fact unless they are clearly erroneous, *see District of Columbia v. Washington Sheraton Corp.,* 499 A.2d 109, 111 (D.C. 1985); *Rock Creek Plaza-Woodner Ltd. Partnership v. District of Columbia,* 466 A.2d 857, 859 (D.C. 1983), and we will not upset the ultimate legal conclusion of the tax court when its outcome necessarily follows from its findings of fact by which we are bound, *District of Columbia v. National Bank of Washington,* 431 A.2d 1, 3 (D.C. 1981). However, "[r]egard for the special function and competence of the Tax Court does not warrant avoiding our responsibility of reaching a decision of our own as to the application of the law to the facts." *District of Columbia v. Seven-Up Washington, Inc.,* 93 U.S. App. D.C. 272, 275, 214 F.2d 197, 200, *cert. denied,* 347 U.S. 989, 74 S.Ct. 851, 98 L.Ed. 1123 (1954). As always, we are free to sustain the trial court judgments on grounds different from those on which the trial court relied. *See Jones v. District of Columbia,* 123 A.2d 364, 365 (D.C. 1956). Applying the above guidelines to the case at hand, we conclude that the tax court's decision does not warrant reversal as the proper result was reached, although, as we will explain, we affirm, as a matter of law, on a basis not adopted by the tax court. *See Marinopoliski v. Irish,* 445 A.2d 339, 340 (D.C. 1982).

## IV

The task before us today is to determine, as a statutory matter of law, what Congress intended by its use of the term "public stenographic services" in the District's sales and use tax provisions. In other words, did Congress intend to include local and federal D.C. court system reporters and Acme's court reporters in its definition of public stenographic services? At the onset, we stress that there is no rational basis on which to distinguish Acme's court reporters from the court system's court reporters in application of the term "public stenographic services" contained in the relevant tax provisions. The wording of the relevant tax code sections requires that sale of transcripts to interested parties by Acme must be treated in a manner identical to the fashion in which sales by local and federal D.C. court system reporters are treated.

In resolving this issue, we focus on the "settled rule that tax laws are to be strictly construed against the state and in favor of the taxpayer," if the statute in controversy is unclear and ambiguous. 3A SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION § 66.01 (C. Sands, 4th ed. 1986); *see also Gould v. Gould,* 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211 (1917). At the same time, we are mindful of the maxim that "tax laws ought to be given a reasonable construction, without bias or prejudice against either the taxpayer or the state, in order to carry out the intention of the legislature and further the important public interests which such statutes subserve." 3A SUTHERLAND, *supra* at § 66.02 (quoting *State v. Brandt,* 255 Minn. 345, 31 N.W.2d 5 (1948)). Further, "[s]ince the obligation to pay taxes arises only by force of legislative action, the nature and extent of that liability is determined by the legislative meaning. Therefore, all the rules of statutory construction are relevant in the interpretation of revenue measures." 3A SUTHERLAND, *supra* at § 66.03.

In construing acts of Congress, "we must look first to the language of the statute and, if it is clear and unambiguous, give effect to its plain meaning." *Office of People's Counsel v. Public Service Commission,* 477 A.2d 1079, 1083 (D.C.1984). Our reading of §§ 47–2001(n)(1)(H) and 47–2201(a)(1)(G) does not leave us with a clear and unambiguous understanding of the phrase "public stenographic services," so as to persuade us to conclude that the plain meaning of the term necessitates inclusion of all court reporters in the District. Nei-

ther the statute itself, nor its implementing regulation, which simply states that the term includes typing services, 9 DCMR § 468.3 (1986), assist in ascertaining the plain meaning of the term "public stenographic services."

Having determined that we are considering a statutory term that on its face is ambiguous and unclear, we turn next to an examination of the legislative history surrounding the enactment of the statutes in question for assistance. *See Office of People's Counsel v. Public Service Commission, supra,* 477 A.2d at 1085. The sales and use tax provisions making "public stenographic services" taxable were enacted by Congress within the District of Columbia Revenue Act of 1969. The District proposed to Congress that the sales and use tax base be expanded to increase revenues. One specific proposal was to extend the sales and use tax to include taxation of "stenographic services." *See Proposals of the District of Columbia Government to Provide Additional Revenue for the District of Columbia: Hearing on H.R. 12982 Before the Committee on the District of Columbia,* 91st Cong., 1st Sess. 10–12 (1969) (statement of Thomas Fletcher, Assistant to the Commissioner). This proposal was based on the August 30, 1968, study of the District's financial advisor, Laszlo Ecker-Rancz, who recommended that if the sales and use taxes were broadened to apply to personal, business, automobile, contractor and repair services, the District could readily increase its tax revenues by as much as twenty percent. The report specified that the services embraced by the enumerated categories include business services: advertising, duplicating, *stenographic,* exterminating, services to building, telephone answering, etc. *Id.*

We find of particular significance the facts that Congress (1) chose to qualify the term as proposed, "stenographic services," by adding to the phrase the word "public," and (2) chose to include the phrase within the paragraph which reads, as adopted, "The sale of or charges for copying, photocopying, reproducing, duplicating, addressing, and mailing services and for public stenographic services." D.C.Code §§ 47–2001(n)(1)(H) and 47–2201(a)(1)(G). We also note that H.R.Rep. No. 463, 91st Cong., 1st Sess. 13 (1969) provides that the imposition of the proposed sales tax would include "[c]harges for duplicating, addressing, and mailing services, including folding and inserting of the materials mailed, and for public stenographic services. A great deal of this type of service is performed in the District, by a number of commercial firms."

We are persuaded that to include court reporters within the term "public stenographic services" is inconsistent with the legislative history, albeit scant, of the District's sales and use tax measures as enacted by Congress. The addition, by Congress, of the word "public" must be acknowledged and accorded some measure of significance. It is a basic axiom of construction that effect must be given every word of a statute and interpretations that operate to render a word inoperative should be avoided. *See* 2A SUTHERLAND, *supra* at § 46.06. "A statute should not be construed in such a way as to render certain provisions superfluous or insignificant." *Tuten v. United States,* 440 A.2d 1008, 1010 (D.C.1982). Thus, because Congress must have intended the addition of the word "public" to have some significance,[6] we reject the District's proposed

**6.** Admittedly, we cannot, and do not claim to know exactly what Congress intended by modifying "stenographic services" with the word "public," but we are capable of assessing the possible and probable reasons for addition. First, if Congress had adopted the District's proposal verbatim and imposed the tax on all "stenographic services," the District's position that Congress intended that sales of transcripts by all court reporters to all parties to be taxed, might have some validity. The phrase "stenographic services" used without qualification is arguably broad enough to subject all types of stenographic services, including court reporting services and public stenographic services, to the sales and use tax. But such is not the case.

Therefore, Congress, intending the addition of the word "public" to have some significance, must have attached one of the two following meanings to the word "public," either of which satisfies us that court reporters were not meant to be taxed. "Public" may have been added so as to make taxable only those transcripts sold by court reporters to non-interested parties to

definition of the term "public stenographic services" as it renders the word "public" meaningless and superfluous.[7]

Additionally, as we indicated previously, the provisions at issue impose sales and use taxes on the sale of or charges for copying, photocopying, reproducing, duplicating, addressing and mailing services, as well as "public stenographic services." D.C.Code §§ 47–2001(n)(1)(H) and 47–2201(a)(1)(G). When the sections are read as a whole, it is apparent that the other services taxed, such as copying, addressing and mailing, etc., are ones generally associated with stenographic services and not court reporting services. *See Dictionary of Occupational Titles, supra* at §§ 202.-362–014 and 202.362–010. A statute, passed as a whole, should be construed as a whole, and the meaning to be attached to a particular term is to be ascribed from the context of the surrounding words and phrases. *See* 2A SUTHERLAND, *supra*, at § 46.05.

We are also mindful of the rule that in determining the true construction of a specific statutory phrase one must consider

the connection of the clause with other clauses in the same statute, and the conclusions which on comparison with other clauses, may reasonably and obviously be drawn.... If the comparison of one clause with the rest of the statute makes a certain proposition clear and undoubted the act must be construed accordingly and ought to be so construed to make it a consistent whole.

2A SUTHERLAND, *supra,* at § 46.06 (quoting *Attorney General v. Sillem,* 159 Eng.Rptr. 178 (1864)).

Application of this rule to the task at hand results in further support for our resolution today. Section 47–2001(n)(2)(B) of the Gross Sales Tax Statute and § 47–2001(a)(2)(B) of the Compensating Use Tax Statute provide that unless specifically enumerated by statute, professional and personal service transactions involving sales of tangible personal property as inconsequential elements for which no separate charges are made, are specifically exempt from the sales and use taxes. Acme's court reporting services satisfy all of the requirements for exemption. This determination follows from the fact that Acme's services (1) are personal or professional services,[8] (2) involve the sale of inconse-

---

the litigation transcribed, *i.e.,* a newspaper, as opposed to those transcripts sold to the interested parties to the litigation. (As we stated in note 4 *supra,* we do not have at issue here the sales of transcripts to uninterested parties to the litigation.) This interpretation logically flows from the premise that court reporting services are not generally offered to the public, but rather to those involved in litigation, which, all too frequently, is not by choice. Additionally, in Acme's situation, its court reporting services are performed pursuant to federal contracts, and in other situations, court reporters work directly for the courts. This precludes one who is a party to the litigation from having available the opportunity to choose who is to provide the court reporting service that transcribes the proceeding. In other words, Acme's services are not sought out by the general public.

"Public" may have been added so as to distinguish court reporters from public stenographers who generally work in hotels, office buildings, and for organizations such as secretarial services, holding themselves out to the general public to perform stenographic services. This interpretation is supported by the Department of Labor's *Dictionary of Occupational Titles* (4th ed. 1977), which lists and defines court reporters and stenographers (which includes the designation of public stenographers) as separate and

distinct occupations. *See id.* at §§ 202.362–014 and 202.362–010.

7. Further, the District's proposed definition attempts to distinguish between stenographic services offered to the public at large and services a stenographer provides to an employer. Again, the word "public" is not needed to make this distinction in the context of the District's sales and use tax law. Stenographers providing services only to an employer would not be subject to the taxes because the taxes apply only to vendors who make certain sales at retail or retail sales. We also note that if the word "public" was needed to make this distinction, then to be consistent, the word "public" should have been added prior to each service taxed, *i.e., public* copying, *public* photocopying, etc. *See* D.C.Code § 47–2001(n)(1)(H) and § 47–2201(a)(1)(G).

8. Although there is no law in this jurisdiction that specifically addresses the characterization of court reporter services, courts and administrative bodies in at least five different states have directly considered the issue of whether court reporting services constitute professional or personal service transactions. All of these authorities agree that the sale of a court reporter's services, including the sale of transcripts,

quential amounts of tangible personal property for which no separate charge is made,[9] and (3) are not specifically enumerated as a taxable service. Thus, because exempt under §§ 47–2001(n)(2)(B) and 47–2201(a)(2)(B), Congress could not have intended to tax Acme's court reporting services under §§ 47–2001(n)(1)(H) and 47–2201(a)(1)(G).

Crucial to our determination today is the rule, stated earlier, that "tax laws ought to be given a reasonable construction ... in order to carry out the intention of the legislature and further the important public interests which such statutes subserve." 3A SUTHERLAND, *supra* at § 66.02 (quoting *State v. Brandt*, 225 Minn. 345, 31 N.W.2d 5 (1948)). In this jurisdiction, "reasonableness of a construction can often be tested by considering the consequences of a different one." *District of Columbia v. Seven-Up Washington, supra,* 93 U.S.App. D.C. at 276, 214 F.2d at 201. If we were to hold that, as the District urges, Congress intended the term "public stenographic services" to include the sales of transcripts by Acme's court reporters to interested parties, it would by necessity follow that the sales of transcripts to interested parties by *all* court reporters in the District, including the local and federal court systems, would likewise be subject to the sales and use tax.[10] This would have a chilling effect on judicial proceedings within the District—not only in the future, but retroactively.[11]

constitutes the sale of personal or professional services rather than the sale of tangible personal property. *See, e.g., Askew v. Bell,* 248 So.2d 501 (Fla.D.Ct.App.1971); *Booth v. City of New York,* 296 N.Y. 573, 68 N.E.2d 870 (1946); New Mexico St. Tax Rep. (CCH), para. 40–742, Ruling 82–185–1 (January 14, 1982); Wash.St. Tax Cas. Rep. (CCH) para. 68–624, WAC 458–20–224 (October 3, 1986); West Virginia St.Tax Cas. (CCH) para. 64–084, Admin. Dec. 80–31–C (July 1981).

However, this jurisdiction has addressed related issues and reached a conclusion that is in agreement with the above authorities. In *District of Columbia v. Universal Computer Associates, Inc.,* 151 U.S.App.D.C. 30, 465 F.2d 615 (D.C.Cir.1972), the issue was the taxability of computer software which transferred information on punch cards. The court held that the purchaser paid for the information stored on the cards and not for the material comprising the cards, and thus, found no tax liability.

In *Human Events, Inc. v. District of Columbia,* Tax Docket No. 2601 (D.C.Sup.Ct., April 12, 1979), the lease of mailing lists provided on either computer tapes or labels was held to be a service transaction. The court adopted, as did the *Booth* court, the reasoning of the New York Court of Appeals in *Dunn & Bradstreet, Inc. v. City of New York,* 276 N.Y. 198, 205, 11 N.E.2d 728, 731 (1937), and opined that when the value of a transaction is information or knowledge, customers are paying for the information, not the written medium on which it is transferred.

Relying on the holdings of the above authorities, it follows here that parties to the proceedings in which Acme is the official court reporter are purchasing the information stored in the transcripts and not the material which composes the transcript. Thus, Acme provides a personal or professional service—reporting of proceedings in the form of official transcripts. *See also District of Columbia v. Norwood Studios, Inc.,* 118 U.S.App.D.C. 358, 336 F.2d 746 (1964); *Washington Times Herald, Inc. v. District of Columbia,* 94 U.S.App.D.C. 154, 213 F.2d 23 (1954).

9. The sale of tangible personal property in connection with professional or personal transactions is an "inconsequential element" of the transaction if "the sale price of the tangible personal property is less than 10% of the amount charged for the services rendered in the transaction." D.C.Mun.Reg. 403.2 (1986). Acme's services clearly fall within the guideline. The tangible personal property sold—the transcripts—is approximately four percent of the amount charged for court reporting services. Further, Acme does not make separate charges on the invoice for transcripts sent to customers.

10. Of course, the District of Columbia and the federal government would continue to be exempt from paying the taxes on transcripts sold to them. *See* D.C.Code § 47–2005(1), (2) (1981).

11. To explain, the statute of limitations for assessment is three or five years, depending upon the particulars of the case. *See* D.C.Code §§ 47–2029; 47–2213; and 47–2011 (1981). Although there are provisions that allow a court reporter who is found liable for back sales and use taxes, to collect the taxes due from his purchaser, *see* D.C.Code §§ 47–2003 and 47–2204 (1981), in reality, this is impractical. The ability to collect sales and use taxes retroactively from the multiple number of purchasers of legal transcripts in the District over the past three or five years is highly questionable and would be quite costly and time consuming. And, of course, it would be the reporters themselves who are ultimately liable for the deficiencies. Also, substantial penalties and interest can be imposed, and prosecution may be initiated. *See* D.C.Code §§ 47–2027; 47–2028; 47–2029; 47–2030; and 47–2213 (1981).

Moreover, as it is literally impossible to challenge a court or agency decision without obtaining a full transcript of the proceedings, the additional sales and use tax charges would

And finally, our determination today is further reinforced by the fact that we do not necessarily have the final word on the issue. Today's holding, although issued by the highest court of this jurisdiction, does not escape review. In the words of Justice Blackmun, "if the Court has misperceived the political will, it has the assurance that because the question is statutory [the legislature] may set a different course if it so chooses." *United Steel Workers of America v. Weber*, 443 U.S. 193, 216, 99 S.Ct. 2721, 2734, 61 L.Ed.2d 480 (1979).[12]

*Affirmed.*

NEBEKER, Associate Judge, dissenting:

If my view were the holding of the court, I am sure an equally as complex rationale as the majority opinion could be written. However, it is hardly worth the candle to undertake such an effort in a dissent. Therefore, I offer a short version of why I would reverse the trial court on the ultimate question of law.

The relevant statute taxes "sale of or charges for ... public stenographic services." D.C.Code § 47–2001(n)(1)(H) (1981).[1]

With all due respect to the majority for its wrestling with the word "public" and generating an ambiguity in the statute, I find the critical clause quite clear. It imposes a tax on sales or charges for stenographic services to the public. Similarly, § 47–2001(n)(1)(F) taxes admission charges respecting "public events," with an exception for admission charges made by a "semipublic institution." There is no mystery in the word public.

That Acme renders stenographic services cannot be gainsaid. That it does so by sale or charge is equally unquestioned. That it does so to the public—not privately or "semipublic[ly]"—is quite clear to me. I would reverse and remand with instructions to enter judgment for the District of Columbia.

make acquisition of already costly transcripts even more of a financial burden on future litigants.

**12.** The District strongly argues that its interpretation of the phrase is a long standing one to which substantial deference must be paid. We agree that generally we should "defer to an agency's interpretation of the statute which it has the duty to enforce, so long as that interpretation is reasonable." *Guerra v. District of Columbia Rental Housing Comm'n*, 501 A.2d 786, 790 (D.C.1985). However, because we bear the ultimate responsibility of interpreting statutes, *Tenants of 3039 Q Street, N.W. v. District of Columbia Rental Accommodations Comm'n*, 391 A.2d 785, 787 (D.C.1978), we must consider various factors in determining the proper deference

to be accorded an agency's statutory interpretation. *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 35, 102 S.Ct. 38, 440, 70 L.Ed.2d 23 (1981).

Guided by the rationale in *Federal Election Commission*, we conclude that the Department's interpretation deserves little or no deference. The claimed interpretation demonstrates a lack of consistency. Further, the Department failed to enforce its interpretation until 1982 and then not against court reporters within the District's local and federal court systems.

**1.** It seems to me that the constant use of the term "court reporting services" in Acme's brief and the majority opinion is quite confusing unless it is understood that it is synonymous with the relevant term "stenographic services."